# NO. 12-22-00106-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *JACOLBE RASHAD KIRBY,*<br>*APPELLANT* | § | *APPEAL FROM THE 369TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *CHEROKEE COUNTY, TEXAS* |

*MEMORANDUM OPINION*
*PER CURIAM*

Jacolbe Rashad Kirby appeals his conviction for capital murder. Appellant's counsel filed a brief in compliance with ***Anders v. California***, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967) and ***Gainous v. State***, 436 S.W.2d 137 (Tex. Crim. App. 1969). We affirm.

## BACKGROUND

Appellant was charged by indictment for capital murder. Appellant pleaded "not guilty," and the matter proceeded to a jury trial. The evidence showed that Appellant was in a four-year relationship with Ka'Deja Deckard that ended in the summer of 2018. The couple lived together for approximately three of those years, and had a daughter together, who was two-and-a-half years old at the time of the murder.

Deckard began dating the victim, Malcolm Hunter, roughly two weeks before this incident, and moved in with him. On July 19, 2018, a few days prior to Hunter's murder, Appellant accused Deckard of having a sexual relationship with Hunter and violently assaulted her at her friend's home. The authorities arrested Appellant after the incident, but he was released from jail.

Between his release and the subsequent shooting on July 22, 2018, Appellant made several incriminating social media posts, including among others:

Never would have thought supporting your family would hurt so much.

Just think if it was your beautiful daughter, wouldn't you do the same? Okay.

How can you take care of my child if y'all can't support yourself? Praying for my baby.

GOING OUT WITH A BANG.

Really don't give a FUCK.

Anyone can get it. Headed to the penitentiary.

Lord, please watch over my child . . . her mother knows no better.

Putting my big boy belt on.

Just please take care of my child.

The most recent post was made just a few hours before the murder.[1]

At approximately 6:00 am on July 22, three masked individuals forcefully kicked open the front door to Hunter's residence. In the living room area, Hunter and Deckard slept on a couch next to Appellant's and Deckard's young daughter. Gloria Blanton, Hunter's mother and an elderly woman who owned the home, was also in the room. She was asleep on a recliner chair while using supplemental oxygen due to her health issues. Komack Johnson, Blanton's cousin, slept on the living room floor. Blanton's two adult sons were asleep in their bedrooms towards the back of the home. They all awoke during the ensuing commotion.

Johnson heard the three perpetrators kick in the door, and the shooter was the only one that spoke. He testified that the shooter said, "Bitch, you don't have to worry. Somebody is going to raise my daughter."[2] Then he shot Hunter. Johnson, who has vision problems, did not affirmatively visually identify Appellant, but inferred it was him from the context in which the statement was made. Deckard identified Appellant as the shooter on the 911 call. Deckard also stated on a responding officer's bodycam that "Jacolbe Rashad Kirby is the only shooter, and that's all you guys need to know." She subsequently testified at trial that she knew Appellant was the

---

[1] Defense counsel later argued at the trial that one interpretation of the social media posts is that Appellant knew he would go to prison for the earlier incident for assaulting Deckard as a violation of his probation, and the posts had nothing to do with publicly announcing an intent to murder Hunter.

[2] The officer who interviewed Johnson testified that he never told him that, "Bitch, you don't have to worry. Some[one] got to raise my daughter." The officer said he would have put that in his report. But the officer did include in his report Johnson's statement that the shooter said, "where is the motherfucker at?" Johnson claimed at trial that he relayed the full statement to the officer the day of the shooting.

shooter because she recognized his voice, glasses, and hand. The other two assailants said nothing during the incident. Appellant shot Hunter six times. By the time paramedics arrived a few minutes later, Hunter died.

Upon receiving the 911 call identifying Appellant as the shooter, a Jacksonville patrol officer recalled seeing Appellant drive in the area less than an hour before the shooting. The officer knew Appellant from prior interactions with him. Realizing the significance of this information, the officer reviewed the camera footage from his patrol unit, which recorded Appellant driving a white Jeep Cherokee at that time. With this information and the assistance of several surveillance cameras from local businesses around Jacksonville, the investigating detectives were able to track Appellant's movements from that point in time up until shortly after the shooting. The videos showed Appellant driving towards Hunter's residence, and parking behind a church approximately 150-200 yards away from the home in a clandestine manner. A few minutes later, shortly after the shooting, the surveillance cameras recorded the Jeep Cherokee leaving the area.

Within an hour of the shooting, without being informed that he was a suspect or otherwise apprehended, Appellant voluntarily arrived at the Jacksonville police station in a different vehicle to "clear his name."[3] He waited with another officer in the intoxilyzer room. A detective arrived shortly thereafter and interviewed Appellant. At some point, Appellant informed the detective that he wished to terminate the interview and leave the police station. As they walked down the hall, the detective formally notified Appellant that he was detained and not free to leave.[4] The detective knew from the inception of the interview that Appellant was identified as the shooter. Appellant told the detective that he was at home at the time of the incident, and his cousins came and told him that he needed to go to the police department to clear his name. The video timeline created by the investigators proved his alibi to be untrue.

The detective took a sample from Appellant's hands and sent it for gunshot residue (GSR) analysis. The results tested positive for only one "indicative gunshot residue particle," not a "characteristic particle," meaning that his hands had the presence of antimony and lead, but no

---

[3] Extensive subsequent law enforcement efforts to locate the Jeep Appellant drove in the surveillance videos proved unfruitful.

[4] Prior to trial, Appellant presented a motion to suppress the interview, alleging that it was a custodial interrogation, conducted without reading his *Miranda* warnings, and involuntary. Law enforcement admitted that it was an interrogation, but since he voluntarily appeared at the station, was told he was free to leave, and not in custody, he was not in fact in custody as that legal term is used in this context. The trial court denied the motion.

barium, all three of which are typically present in GSR. The forensic chemist testified that the combination of antimony and lead, without barium, may be associated with some causes other than gunshot residue. Appellant claimed he was handling fireworks that were in his truck, explaining the powder residue. The truck was at the home of one of Appellant's relatives. A search of the truck revealed no fireworks or other items that would transfer those particles. The chemist admitted that there would usually be more particles present from a gunshot, and that he could not conclusively say that Appellant fired a weapon based solely on the sample provided. Furthermore, although there was blood on Appellant's clothing he wore during the interview, it was tested for DNA, but did not match Hunter's DNA. The detectives intended to send the clothing for a GSR analysis as well, but for unexplained reasons, this testing was never performed. There was conflicting testimony as to whether the three assailants wore gloves during the shooting, and the witnesses testified that they wore dark clothing, including "hoodies." The video surveillance footage shows Appellant in a white t-shirt and blue jeans, which appeared to be the same or similar clothing he wore when he arrived at the police station.

Appellant's cellmate at the county jail, expecting a plea deal for his own infractions, contacted the authorities claiming that Appellant told him that he shot Hunter. They gave him no such plea deal in return for his testimony, but he nevertheless decided to testify as to Appellant's admissions. The reason he provided was that he wanted to see justice served because he knew Hunter and did not believe he deserved to be killed. Defense counsel pointed out the cellmate's extensive criminal history and prior false denial as a "snitch" in another case.

The jury ultimately found Appellant "guilty" of capital murder, and the trial court sentenced him to life imprisonment without the possibility of parole. After his motion for new trial was denied, this appeal followed.

### ANALYSIS PURSUANT TO *ANDERS V. CALIFORNIA*

Appellant's counsel filed a brief in compliance with *Anders v. California* and *Gainous v. State*. Appellant's counsel states that he diligently reviewed the appellate record and is of the opinion that the record reflects no reversible error and that there is no error upon which an appeal can be predicated. He further relates that he is well-acquainted with the facts in this case. In compliance with *Anders*, *Gainous*, and *High v. State*, 573 S.W.2d 807 (Tex. Crim. App. [Panel Op.] 1978), Appellant's brief presents a chronological summation of the procedural history of the

4

case and further states that Appellant's counsel is unable to raise any arguable issues for appeal.[5] We likewise have reviewed the record for reversible error and found none.

C<span style="font-variant:small-caps">ONCLUSION</span>

As required by *Stafford v. State*, 813 S.W.2d 503 (Tex. Crim. App. 1991), Appellant's counsel moved for leave to withdraw. *See also In re Schulman*, 252 S.W.3d 403, 407 (Tex. Crim. App. 2008) (orig. proceeding). We carried the motion for consideration with the merits. Having done so and finding no reversible error, we grant Appellant's counsel's motion for leave to withdraw and affirm the trial court's judgment. As a result of our disposition of this case, Appellant's counsel has a duty to, within five days of the date of this opinion, send a copy of the opinion and judgment to Appellant and advise him of his right to file a petition for discretionary review. *See* TEX. R. APP. P. 48.4; *In re Schulman*, 252 S.W.3d at 411 n.35. Should Appellant wish to seek review of this case by the Texas Court of Criminal Appeals, he must either retain an attorney to file a petition for discretionary review on his behalf or he must file a petition for discretionary review pro se. Any petition for discretionary review must be filed within thirty days from either the date of this opinion or the date that the last timely motion for rehearing was overruled by this court. *See* TEX. R. APP. P. 68.2. Any petition for discretionary review must be filed with the Texas Court of Criminal Appeals. *See* TEX. R. APP. P. 68.3(a). Any petition for discretionary review should comply with the requirements of Texas Rule of Appellate Procedure 68.4. *See In re Schulman*, 252 S.W.3d at 408 n.22.

Opinion delivered September 13, 2023.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

---

[5] In compliance with **Kelly v. State**, Appellant's counsel provided Appellant with a copy of the brief, notified Appellant of his motion to withdraw as counsel, informed Appellant of his right to file a pro se response, and took concrete measures to facilitate Appellant's review of the appellate record. *See* **Kelly v. State**, 436 S.W.3d 313, 319 (Tex. Crim. App. 2014). Appellant was given time to file his own brief. The time for filing such a brief has expired, and no pro se brief was filed.



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

SEPTEMBER 13, 2023

NO. 12-22-00106-CR

**JACOLBE RASHAD KIRBY,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 369th District Court
of Cherokee County, Texas (Tr.Ct.No. 20965)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below be in all things **affirmed**, and that this decision be certified to the court below for observance.

By *per curiam* opinion.
*Panel consisted of Worthen, C.J., Hoyle, J. and Neeley, J.*